Filed 5/15/23  P. v. Davis CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B321334 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A653841) |
| v. | |
| DWAYNE ELLIS DAVIS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Affirmed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and Blake Armstrong, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Dwayne Ellis Davis (defendant) was convicted of first degree felony murder and attempted robbery in 1989. In 2019, defendant petitioned for resentencing under Penal Code section 1172.6 (former Penal Code section 1170.95).[1] The trial court issued an order to show cause, found beyond a reasonable doubt that defendant was a major participant in the underlying felony who acted with reckless indifference to human life, and denied the petition. We are asked to decide (only) whether substantial evidence supports the trial court's reckless indifference finding.

## I. BACKGROUND

Defendant was convicted of first degree felony murder and three counts of attempted robbery in 1989. As to each count, the jury found true the allegation that a principal was armed with a handgun. The trial court sentenced defendant to 25 years to life in state prison on the murder count, plus a consecutive term of one year for the firearm enhancement on that count.[2] This court affirmed the judgment on appeal in 1992. (*People v. Davis* (Dec. 31, 1992, B048427) [nonpub. opn.] (*Davis I*).)

Defendant filed a petition for resentencing under section 1172.6 in 2019. The trial court summarily denied the petition because it read the factual background set forth in our opinion in

---

[1]    Undesignated statutory references that follow are to the Penal Code.

[2]    The trial court sentenced defendant to concurrent terms of two years on each of the attempted robbery counts and stayed additional one-year terms for the firearm enhancements on those counts.

*Davis I* to establish that defendant was a major participant in the underlying felony who acted with reckless indifference to human life. We reversed and remanded for the trial court to appoint counsel and to conduct further proceedings in accordance with the terms of section 1172.6. (*People v. Davis* (May 21, 2020, B298618) [nonpub. opn.].) On remand, the trial court issued an order to show cause and held a hearing on defendant's petition.

Neither the prosecution nor defendant, who was represented by counsel at the hearing, presented new evidence. The trial court accordingly relied on the reporter's transcript from defendant's 1989 trial in making its ruling.

### A. *1989 Trial Testimony*

Defendant and co-defendant Manuel Lee Hill (Hill) were tried together using two juries.

Juan Carlos Almaraz (Almaraz) testified that he and two other men, Gustavo Franco (Franco) and Jose Carrillo (Carrillo), went to a liquor store in Compton around 10:40 p.m. on November 26, 1988. After leaving the store, they were followed by three other men. When the men following Almaraz and his group began to run, Franco and Carrillo fled but Almaraz turned and "stood there." The men demanded money from Almaraz. One held Almaraz from behind, and another pointed a gun at Almaraz's stomach. The barrel of the gun was two or three inches from Almaraz. Almaraz identified the gun—a chrome-colored handgun with a white handle—at trial.

When Almaraz said he did not have any money, the man holding him from behind checked his pockets. This person continued to restrain Almaraz as the other two men (one of whom had the gun) ran off in pursuit of Almaraz's companions.

Almaraz saw the man with the gun fire three shots. (Investigators later found three .25 caliber casings at the scene.) The shooter and the third man ran back toward Almaraz and the man restraining him, and the three perpetrators ran away together.

Almaraz ran in the opposite direction to see what happened to his companions. Carrillo lay on the ground, but he stood up and crossed the street holding his stomach. He fell again, and Almaraz sought help.[3] Almaraz testified that police arrived about two minutes after the shooting.

Carrillo died. The medical examiner who performed the autopsy testified Carrillo suffered two gunshot wounds. One bullet entered his back and passed through his heart and left lung, and the other hit his left buttock. A person suffering these wounds would have lived only a few minutes. A Los Angeles County Sheriff's Deputy testified that the bullets recovered from Carrillo's body were consistent with bullets test-fired from the gun Almaraz identified at trial.

Almaraz testified that people began to gather when police arrived. Almaraz told police at the scene that two of these bystanders were involved in the robbery. Almaraz believed defendant was one of the people he pointed out to police, but he was "[n]ot very sure." Almaraz could not positively identify either defendant or co-defendant Hill at trial (because he did not

---

[3]     The trial court sustained a foundation objection to Almaraz's testimony that "[a] lady that was there" called the police, and Almaraz was not asked any further questions on this topic.

4

get a good look at the robbers' faces), but he testified that neither of them was the shooter.

Detective John Swanson of the Compton Police Department testified that the men Almaraz identified the night of the incident were Sean Ford (Ford) and Larry Blouin (Blouin).[4] Ford and Blouin were arrested at the scene. A couple days later, police arrested Hill's brother, Percy Miles (Miles), who was in possession of the murder weapon. Detective Swanson asked Miles how he came to have the gun and subsequently arrested defendant. Defendant told Detective Swanson he loaned the gun to Ford, and Ford said the gun had been "used" when he returned it to defendant.

Prosecutors initially determined they did not have sufficient evidence to proceed against defendant and he was released from custody. Detective Swanson subsequently spoke with him as a witness on several occasions. Eventually, based on information from Miles, Detective Swanson considered defendant a suspect once again and arrested him.

Detective Swanson's tape-recorded post-arrest interview of defendant was played at trial. The audio was not reported in the trial transcript and the tapes were not before the section 1172.6 court during the evidentiary hearing on defendant's petition. Defendant testified at trial, however, and he acknowledged making certain statements to Detective Swanson.

Defendant testified that he and Miles found the gun in some bushes two or three months before the robbery-murder. Defendant kept the gun at night and Miles took it during the day,

---

[4] An unidentified woman also identified Ford and Blouin at the crime scene.

with the two passing it back and forth on a daily basis. The last time defendant had the gun was when Miles picked it up on the morning of the robbery-murder. Defendant testified he falsely told Detective Swanson he sold the gun to Miles at Miles's urging. Defendant testified he was in a liquor store playing a video game at the time of the robbery-murder and walked outside when he heard gunshots—but saw nothing. He only learned what had happened when he returned to the store the next day and spoke with a clerk.

Defendant acknowledged telling Detective Swanson that he, Hill, and Hill's cousin, Antonio Ward (Ward), went out to commit a robbery. Defendant acknowledged saying he told Miles that Hill "did something with the gun" and "'did a Mexican.'" Defendant also acknowledged saying that he hid the gun in an alley after the robbery, retrieved it the next morning, and sold it to Miles the same day. Defendant testified these statements were false and he made them because Detective Swanson said he would be "getting . . . [o]ut of jail soon" if he did.[5]

Other defense witnesses included Hill's mother and girlfriend, who served as alibi witnesses for Hill, and 13-year-old

---

[5]     As summarized in *Davis I*, defendant's recorded statement indicated that "[defendant], Hill . . . and . . . Ward committed the robbery. They went to the liquor store because they were going to 'jack' (rob) someone. The gun was [defendant's]; Tony had the gun at the liquor store, but it was Hill who shot [Carrillo]. Something went wrong during the robbery, when one of the [victims] ran. [Defendant], Hill [and] Ward all ran back to [defendant's] house. [Defendant] took the gun from Hill and hid it in an alley. The next morning, [defendant] retrieved the gun. He sold it later that night to Percy Miles."

6

Mark Jamal Hanna, who testified that the shooter was not Hill, but rather a "guy [who] hop[ped] out" of a Mazda car. Hill also testified, but defendant's jury did not hear that testimony.

B. *The Section 1172.6 Court's Ruling on Defendant's Petition*

At the outset of the hearing on defendant's petition, the section 1172.6 court emphasized it was not relying on our opinion in *Davis I* in assessing the facts of the case. Rather, the trial court relied "solely on the facts of the reporter's transcript of the jury trial, again, excluding the portions where [defendant's] jury was not present." The trial court found that defendant "was an individual who either was standing behind [Almaraz] doing—for lack of a better phrase or term, a pocket check while holding the neck or jacket area of [Almaraz] preventing him from leaving or was one of the individuals standing to his left or right without the gun." Defendant then either continued to hold Almaraz or joined the shooter in pursuing Carrillo and Franco. The gun belonged to defendant, and he provided it to the shooter "loaded with at least three rounds." Defendant then took the gun back from the shooter and sold it.

The trial court compared these facts to those in *In re Loza* (2017) 10 Cal.App.5th 38 (*Loza*), in which this court denied a habeas petition challenging the sufficiency of the evidence supporting section 190.2 special circumstance findings based on the defendant's role as a major participant who acted with reckless indifference to human life in the course of a gas station robbery in which two clerks were killed. (*Id.* at 41-42.) The *Loza* panel emphasized, among other things, that the defendant in that case handed the gun to the shooter and held a door open to

7

facilitate his and the shooter's escape.  (*Id.* at 49-51.)  The trial court reasoned defendant's conduct in this case went "above and beyond" that in *Loza* because, rather than merely holding a door, defendant "held [Almaraz] by the back of the neck or jacket area preventing him from hindering the other suspects . . . or [defendant] was the individual that ran after the other victim with the shooter assisting that individual in the shooting, preventing . . . him from being hindered from doing that."

Based on its findings that defendant was a major participant in the attempted robbery who acted with reckless indifference to human life, the trial court concluded defendant was ineligible for resentencing under section 1172.6.

## II.  DISCUSSION

Defendant concedes the trial court's finding that he was a major participant in the attempted robbery is supported by substantial evidence and he challenges only the finding that he acted with reckless indifference to human life.  Although defendant correctly observes that knowing an accomplice is armed (as defendant knew here) is not alone sufficient to support a reckless indifference finding, there is other evidence that also supports the trial court's finding that he disregarded a grave risk of death—including the evidence of defendant's role in supplying and disposing of the murder weapon and the absence of any effort to restrain the shooter or aid Carrillo.  We shall elaborate, but under the governing substantial evidence standard (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022), there is no basis to reverse the trial court's ruling.

8

*A.     The Reckless Indifference to Human Life Standard*

Until recently, "neither the United States Supreme Court nor California courts offered much guidance about the major participant or reckless indifference standards . . . ." (*People v. Strong* (2022) 13 Cal.5th 698, 705.) Our Supreme Court "first undertook to provide that guidance in [*People v.*] *Banks* [(2015) 61 Cal.4th 788 (*Banks*)]." (*Ibid.*) The Court set forth a non-exhaustive list of considerations relevant to determining whether a defendant was a major participant and emphasized that "[r]eckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death."' [Citations.]" (*Banks*, *supra*, at 807.) The Court further emphasized that "knowledge of the possible risk of death inherent in certain felonies (like armed robbery)" does not constitute reckless indifference to human life. (*Id.* at 809.) "[O]nly knowingly creating a 'grave risk of death' satisfies" the standard. (*Id.* at 808.)

One year later, in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court discussed the reckless indifference standard in greater detail. The Court stated, as a general matter, that this element "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at 617.) The Court then set forth a non-exhaustive list of "case-specific factors that [it] and other state appellate courts have considered in upholding a determination of reckless indifference to human life . . . ." (*Id.* at 618.) The factors include (1) the defendant's awareness that a gun will be used, whether the defendant personally used a gun (even if not to kill the victim), and the number of guns used; (2) the defendant's

9

physical proximity to the murder and, relatedly, opportunities to restrain the killer or aid the victim; (3) the duration of the felony; (4) the defendant's knowledge "of factors bearing on a cohort's likelihood of killing"; and (5) the defendant's efforts to minimize the risk of violence during the felony.[6] (*Id.* at 618-622; see also *In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*) ["Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation"'"].)

> B. *Substantial Evidence Supports the Section 1172.6 Court's Finding that Defendant Exhibited Reckless Indifference to Human Life*

Although the factors discussed in *Clark* and *Scoggins* are present to varying degrees in this case, the "totality of the circumstances" (*Scoggins*, *supra*, 9 Cal.5th at 677) provides

---

[6] Because the defendant in *Clark* acted as the (abortive) getaway driver in the armed robbery of a retail store during which an employee's mother was shot and killed, the Court framed its discussion around "cases involving nonshooter aiders and abettors to commercial armed robbery felony murders." (*Clark*, *supra*, 63 Cal.4th at 618.)

10

sufficient support for the section 1172.6 court's finding that the prosecution proved defendant acted with reckless indifference to human life.

### 1. Defendant's role in supplying and disposing of the murder weapon

"The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at 618, citing *Banks*, *supra*, 61 Cal.4th at 809.) Nonetheless, *supplying* a loaded gun to an accomplice who uses it to kill can support a finding that a defendant was recklessly indifferent to human life. (See, e.g., *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [affirming finding of reckless indifference where the defendant gave a loaded gun to the shooter and "made no effort to unload it or to caution [the shooter] about restraining his conduct"]; *In re Parrish* (2020) 58 Cal.App.5th 539, 541, 544 [reckless indifference established where the defendant "supplied" one of two guns used in robbery]; *Loza*, *supra*, 10 Cal.App.5th at 53 ["more than simply knowing [the shooter] would use a gun during the robbery, [the defendant] supplied [the shooter] with it immediately beforehand"].)

Defendant, however, contends his role in supplying the murder weapon is comparable to the defendant's actions in *In re Ramirez* (2019) 32 Cal.App.5th 384 (*Ramirez*), which were found to be not especially probative of a reckless indifference to human life. The defendant in *Ramirez* shared a room with a juvenile accomplice in the home of the roommate's parents. (*Id.* at 389.) When the defendant found two guns in an abandoned house, the defendant practiced firing them with the roommate and the

11

roommate's friend, and the roommate hid them under his bed. (*Ibid.*) Two days later, the defendant went out with the roommate and the roommate's friend, who told him they were each carrying one of the guns to protect themselves from members of a rival gang. (*Ibid.*) Later joined by a fourth person, the group decided to rob someone in a bar parking lot. (*Id.* at 390.) The roommate gave the gun he carried to the fourth person, and the defendant and the roommate waited across the street while the other two robbed—and shot and killed—a bar patron. (*Ibid.*)

The Court of Appeal reversed the trial court's section 190.2 special circumstance finding for lack of sufficient evidence of a reckless indifference to human life. The appellate court did so acknowledging a factfinder reasonably could have inferred the defendant supplied the guns that ultimately were used in the attempted robbery, albeit at a time when there was no evidence that criminal conduct was then contemplated. (*Id.* at 404.)

Here, defendant's role in supplying the murder weapon was substantially greater than discovering it and relinquishing it to someone other than the shooter days before a murder. In contrast to *Ramirez*, defendant exercised greater control over the murder weapon than either of his accomplices. Defendant testified he shared the gun with Miles (who was not involved in the robbery-murder) and defendant admitted he took responsibility for hiding the gun *after* the murder and subsequently sold it to Miles.[7] Additionally, unlike in *Ramirez*,

---

[7] Defendant's after-the-fact repossession and sale of the weapon that he knew was used to shoot Carrillo is significant. At most, it provides a basis to infer defendant expected in advance

the evidence supports the inference that defendant must have provided the gun to the shooter not long before the robbery-murder: defendant testified he and Miles passed the gun back and forth on a daily basis, with defendant taking possession at night.

> 2.    *Defendant's proximity to the murder and opportunity to restrain the shooter or aid Carrillo*

"Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force.  In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . .  [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts.  If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'  [Citation.]" (*Clark*, *supra*, 63 Cal.4th at 619.)

Almaraz's testimony indicates defendant was close enough to see the shooting, either because he was holding Almaraz (who saw the shooter fire) or pursuing Carrillo and Franco alongside the shooter.  Although courts assign less weight to this factor in cases involving relatively sudden or spontaneous acts of violence

---

that the gun would be used to kill.  At least, it provides a basis to infer defendant was indifferent to how the gun had been used.

13

(*People v. Keel* (2022) 84 Cal.App.5th 546, 560 (*Keel*); *In re McDowell* (2020) 55 Cal.App.5th 999, 1014), it remains significant that defendant did not caution the shooter against using the gun nor urge him not to pursue the fleeing victims. In addition, defendant was not a passive observer. Whether he joined the shooter in pursuing Carrillo and Franco or continued to restrain Almaraz, defendant ensured the shooter was not outnumbered. (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [reasoning that a defendant who "used his weapon to keep . . . other [robbery] victims at bay . . . actively enabled the murder" of a victim in another room].)

Defendant's failure to render or summon aid also supports a finding of reckless indifference to human life. Defendant's contention that nothing he could have done "would have made any difference" erroneously frames the issue in terms of whether he could have saved Carrillo after he was shot. The relevant inquiry, however, is what defendant's actions say about his "frame of mind concerning [Carrillo's] death." (*Clark*, *supra*, 63 Cal.4th at 620.) Despite the medical examiner's testimony that a person with Carrillo's wounds would not have lived more than a few minutes, there is no indication that a lay person would have known the wounds would prove fatal; Almaraz testified Carrillo was able to stand and cross the street even after defendant and his companions fled. And although someone evidently called for help, there is no indication defendant knew they had done so or that police were on the way. Defendant's comparison of this case to *In re Taylor* (2019) 34 Cal.App.5th 543, in which the Court of Appeal held the defendant's flight from the scene of a murder did not reflect reckless indifference to human life in part because "it

14

appear[ed] [the defendant] knew help was arriving" (*id.* at 559), is therefore inapposite.

### 3. *Duration of the robbery*

As our Supreme Court explained in *Clark*, "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder. The duration of the interaction between victims and perpetrators is therefore one consideration in assessing whether a defendant was recklessly indifferent to human life." (*Clark, supra,* 63 Cal.4th at 620.) *Clark* cites *Tison v. Arizona* (1987) 481 U.S. 137, in which the defendants "'guarded the victims at gunpoint while [the group of perpetrators] considered what next to do,'" to illustrate the principle. (*Clark, supra,* at 620.) At the other end of the spectrum are brief encounters in which "events unfurl[ ] in rapid succession" and deadly violence is an "''impulsive" response to the victim's unexpected resistance, as opposed to the culmination of a prolonged interaction that increased the opportunity for violence.' [Citations.]" (*Keel, supra,* 84 Cal.App.5th at 561.)

Although there was no extended contact between the robbers and victims in this case, defendant helped to prolong the incident either by restraining Almaraz while his companions pursued Carrillo and Franco or by joining the shooter in the pursuit. The decision to pursue (or facilitate the pursuit of) Carrillo and Franco with a gun increased the risk of deadly violence because Carrillo and Franco's flight demonstrated they had no intention of yielding to threats alone. Under these

15

circumstances, the brevity of the encounter is at best a neutral factor.

### 4.	*Defendant's knowledge of the shooter's propensity to use deadly violence*

"A defendant's knowledge of factors bearing on a cohort's likelihood of killing are significant to the analysis of reckless indifference to human life.  [The] [d]efendant's knowledge of such factors may be evident before the felony *or may occur during the felony*." (*Clark, supra*, 63 Cal.4th at 621, emphasis added.)  Here, as in *Clark*, "no evidence was presented at trial that [the shooter] was known to have a propensity for violence, let alone evidence indicating that defendant was aware of such a propensity." (*Ibid.*)  Unlike the defendant in *Clark*, however, who "had no opportunity to observe anything in [the shooter's] actions just before the shooting that would have indicated that [the shooter] was likely to engage in lethal violence" (*ibid.*), defendant was present to see the shooter point a loaded gun at Almaraz's stomach.  Defendant's inaction as the shooter ran off in pursuit of Carrillo and Franco was informed by knowledge that the shooter had no compunctions about making active use of the firearm.

Defendant contends the sheer senselessness of the shooting—nobody even checked Carrillo's pockets—demonstrates he could not have anticipated it.  This argument assumes, with no basis, that the shooter and the person who joined him in chasing Carrillo and Franco did not have good reason (e.g., lack of ammunition) to break off the pursuit.  More significantly, even if defendant and his associates simply panicked and fled with nothing to show for their efforts, this does not mean the shooter never had a motive to fire.

16

### 5. Efforts to minimize risk of violence

In *Clark*, our Supreme Court determined "there [was] evidence that [the] defendant planned the crime with an eye to minimizing the possibilities for violence" because, among other things, he planned to rob a store "after closing time, when most of the employees had left the building" and "there were not supposed to be any bullets in the gun" used in the robbery. (*Clark, supra*, 63 Cal.4th at 621-623.) Defendant does not identify any specific actions he took to minimize the risk of violence in this case, but he suggests this factor is neutral because "there appears to be nothing in the plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at 623.) We accept this factor does not point strongly one way or the other, but that does not help defendant in light of our analysis of the other factors—particularly his role in supplying the murder weapon and failure to do anything to restrain the shooting or summon aid.

### 6. Defendant's youth

In addition to the factors identified in *Clark* and *Scoggins*, some courts have recognized youth as a relevant consideration in determining whether a defendant acted with reckless indifference to human life. (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 990; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091-1093 (*Jones*).) They have done so even where the defendant is 18 or older. (*Jones, supra*, at 1092-1093 [reversing denial of resentencing petition and remanding for consideration of 20-year-old's youth].) Defendant, who was 18 years old at the time of the offense, argues for the first time in his reply brief that his age weighs against a reckless indifference finding. Assuming defendant's

17

age is an appropriate factor, it does not outweigh defendant's conduct that demonstrates his indifference as the robbery in this case escalated to murder. As one court has stated, "Youth can distort risk calculations. Yet every 18 year old understands bullet wounds require attention. The fact of youth cannot overwhelm all other factors. [Citation.]" (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 595.)

## DISPOSITION

The order denying defendant's petition for resentencing is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM, J.

18